UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-cr-00098 (MJD)

UNITED STATES OF AMERICA,
Plaintiff,

v.

CHARLES RAY WORKMAN,
Defendant.

**GOVERNMENT'S INITIAL SENTENCING POSITION**

The United States of America recommends the Court sentence the defendant, Charles Workman, to a term of imprisonment in the middle of the applicable guidelines range of 37-46 months,[1] as well as an order of restitution in the amount of $1,153,241.32,[2] and a period of supervised release of 3 years to follow. Such a sentence would be sufficient, but not greater than necessary, to achieve the objectives of sentencing articulated in 18 U.S.C. § 3553(a).

---

[1] This is based on: a base offense level of 7, U.S.S.G. § 2B1.1(a)(1); a 14-level enhancement given an intended loss amount greater than $550,000 but not more than $1,500,000, U.S.S.G. § 2B1.1(b)(1); a 2-level enhancement because the offense involved 10 or more victims, § 2B1.1(b)(2)(A)(i); a 3-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1(a) and (b); and a criminal history category of II, U.S.S.G. § 4A1.1. This results in a total adjusted offense level of 20 (*see* PSR ¶¶ 24-34, 51, 125).

[2] In its objections, the government noted a small discrepancy in the amount of restitution specified in the plea agreement, and that calculated in the PSR based upon information provided by the government (*see* PSR p. A.1). The government has since determined that the figure in the PSR is correct, and should serve as the basis of restitution (*see* PSR ¶ 20).

## FACTUAL AND PROCEDURAL BACKGROUND

The government concurs with the presentence investigation report's description of the offense conduct, as further detailed in the plea agreement and colloquy (PSR ¶¶ 11-18; Plea Agreement, Dkt. 70 ¶ 2), as well as pretrial conduct (PSR ¶¶ 5-9).

### I. Offense Conduct

On February 16, 2021, the defendant registered MN Crete Pools, LLC, in Minnesota (PSR ¶ 12). For the next two years, his business marketed concrete swimming pools and pool installation services to customers in the Twin Cities area (PSR ¶¶ 12-13). He solicited and received downpayments from customers, falsely representing to some of them that he could "secure" a spot in MN Crete Pool's workload in exchange for a downpayment, in the same year it was made (PSR ¶ 13). He would continue to solicit and sign up additional customers after making that representation (PSR ¶ 13). He collected about one downpayment per month from April to June 2021, and failed to complete projects for any of those customers, even as he increased the rate at which he signed up new customers and collected downpayments in the remaining summer months (PSR ¶ 14). He would represent that he would only take a few weeks to finish new customers' pool projects, even though he knew he had still not fully completed any of the projects he started earlier that year (PSR ¶ 14). He would also at times solicit additional payments beyond the downpayments for the excavation of a hole or by falsely representing he ordered equipment (PSR ¶ 16).

Sometimes, the defendant would use some or all of the customers' payments for his own benefit, including (but not limited to) more than $3000 on child support, more than $6000 on a horse and saddle, and more than $18,000 at a casino, beyond MN Crete Pools' payroll (PSR ¶ 15). This misuse of money left MN Crete Pools unable to meet its obligations and unable to refund its customers' money, even though many of them never received swimming pools (PSR ¶ 17). He even falsely represented each pool would be protected by a "lifetime guarantee," despite knowing that many of them were unlikely to even be completed in the first place (PSR ¶ 17). He would falsely claim that failures to construct and install pools were due to COVID-related delays, weather, or equipment shortages, even though he knew the delays were caused by his own failure to fully utilize downpayments for completion of promised work (PSR ¶ 17).

In all, the scheme involved 21 customers who hired MN Crete Pools to construct swimming pools, and from whom the defendant collected downpayments (PSR ¶ 19). The defendant has agreed to restitution in the amount of $1,153,241.32 to these victims, as delineated in the PSR (*see* ¶ 20). Two victims provided statements, one expressing a sense of betrayal, and another identifying damage to their property separate from the funds they had paid the defendant (PSR ¶ 21).

**II. Procedural History**

On March 15, 2023, the U.S. Attorney's Office charged the defendant by indictment with four counts of wire fraud in violation of 18 U.S.C. § 1343 (ECF No. 1; PSR ¶ 1). The defendant was arrested in the Middle District of Tennessee on March

27, 2023, and made his initial appearance in the District of Minnesota on April 10, 2023, after which he was released on personal recognizance, with conditions (PSR ¶ 5). On August 19, 2025, 28 months later,[3] the United States Probation Officer filed a violation report indicating that the defendant violated his conditions of release by being charged with felony offenses of Theft of Property and Worthless Checks on August 13, 2025, in Tennessee (PSR ¶ 6). The defendant was brought to the District of Minnesota on August 19, 2025, and temporarily detained on September 5, 2025 (PSR ¶ 6). Following a hearing on September 16, the defendant pled guilty to Count 1[4] of the indictment and was conditionally ordered released (ECF No. 67). A detention hearing was held on September 17, 2025, and conditional release was revoked (ECF No. 71).

On October 17, 2025, the defendant filed a Motion for Reconsideration Based on New Information, wherein he informed that the bank account linked to the criminal charges in Tennessee had been closed, which the Court denied (PSR ¶ 7; ECF No. 76). The defendant filed a second Motion for Reconsideration of Detention Based on New Information, claiming that his fiancée was at risk of preterm labor, and that he had filed a dissolution of his business with the State of Kentucky, and no

[3] In the intervening period, the defendant filed five motions to exclude time under the speedy trail act (ECF Nos. 18, 25, 29, 33, 37), filed a January 2024 letter requesting cancellation of pretrial motions hearing, citing potential resolution of the case (ECF Nos 43, 44), and there was a scheduled change of plea hearing 15 months later for July that was canceled and reset for August 26, 2025 (ECF No. 53).

[4] The government agreed to move to dismiss the remaining counts at the time of sentencing. *Id.*

longer had any ownership or management authority in any business (PSR ¶ 8). The Court ultimately granted this motion, and the defendant was released on personal recognizance bond with conditions (PSR ¶ 8).

**THE APPROPRIATE SENTENCE**

The government submits that a guideline sentence, at the middle of the guideline range, is appropriate. The government submits that some carceral sentence is warranted here to promote respect for the law, afford adequate deterrence, and be commensurate with the seriousness of the offense. A sentence in the middle of the guideline range is appropriate.

I. Legal Standard

*Gall v. United States*, 552 U.S. 38, 49-50 (2007), sets forth the Court's sentencing methodology: the Court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence. *See United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009).

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49. "[U]nder the advisory guidelines scheme, sentencing judges are required to find sentence enhancing facts only by a preponderance of the evidence." *United States v. Scott*, 448 F.3d 1040, 1043 (8th Cir. 2006). In addition, a district court must assess the other applicable sentencing factors under Section 3553(a). Those factors include the nature and circumstances of the offense; the history and characteristics of the

defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to victims. 18 U.S.C. § 3553(a).

**II. Evaluation of § 3553(a) Factors**

The most relevant § 3553(a) factors in this case are the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense and to promote respect for the law, as well as to afford adequate deterrence.

The nature and circumstances of the offense are egregious. The defendant defrauded 21 people out of a total of more than a million dollars over the course of a couple years. Instead of using their deposits to pay for expenses to build the promised pools, he used the money on himself. This was not a transitory error in judgment, but a scheme that lasted multiple years. Such magnitude of financial harm over a protracted period merits significant punishment. It should also be read in the context of his overall history.

The government acknowledges that the defendant's history and characteristics present some mitigating factors. In particular, the defendant reportedly experienced adversity in his home life (PSR ¶¶ 58, 59, 60), and reportedly received an Adverse Childhood Experience score of 9/10 (PSR ¶ 77). He also reportedly has been diagnosed with posttraumatic stress disorder, potentially

related to exposure to direct combat conditions (PSR ¶ 74). Notably, his wife indicated that she had no concerns about his emotional health, and he expressed no desire to receive mental health services (PSR ¶ 74). While he received some cognitive behavior therapy while incarcerated, he completed only three weeks of an eight-week program (PSR ¶ 75). Taken together, these factors provide some mitigation, but not sufficient to go below the guideline range.

The defendant's history and characteristics also present some aggravating factors. Notably, the defendant appears to have a history of opening questionable business, of which the company that was the subject of the offense conduct was only one of eight, mostly having concrete as a common thread (*see* PSR 86-93). He failed to disclose his involvement in two of these businesses during the presentence interview, even though the tax returns indicate that one of them, Precision Crete, LLC, was his sole source of income in 2023 and 2024 (*see* PSR ¶¶ 90-91, 96). He failed to indicate on his returns that he started the business in 2023, even though Kentucky Secretary of State Records reflect he incorporated Precision Crete on June 5, 2023 (PSR ¶ 96), which was after he made his initial appearance and began pretrial supervision in this matter. The defendant has also had multiple monetary judgments entered against him relating to his business practices over the years, including some that appear to relate to the offense conduct (PSR ¶¶ 102-107, 109-112, 114, 116-118). Additionally, the defendant's criminal history extends back to age 23, and includes multiple domestic violence offenses, and four separate cases involve domestic abuse violations of orders for protection, as well as a conviction for

driving under the influence (PSR ¶ 146).

This history underscores the need to promote respect for the law, and to provide deterrence, not simply generally toward others, but specifically toward the defendant himself. There is limited evidence to show that the defendant has genuinely changed his ways. A material consequence is warranted. A sentence of imprisonment will both provide just punishment, and provide protection of the public during the period of incarceration.

To the extent that defendant may cite family reasons as a basis for a lesser sentence (*see* PSR ¶ 68; ECF Nos. 107, 112), the facts of this case do not demonstrate that the defendant has provided the sort of extraordinary, irreplaceable caregiving of the type that the Eighth Circuit has found could warrant a departure or variance.[5] *See*, *e.g.*, *United States v. Underwood*, 639 F.3d 1111, 1113-1114 (8th Cir. 2011) (affirming denial of variance based on child with muscular dystrophy who required around-the-clock care where doctor indicated mother could provide care with occasional assistance from family or friends); *United States v. Bieri*, 21 F.3d 811, 818 (8th Cir. 1994) (sentencing parents of two small children to prison not outside the "heartland" to qualify as extraordinary circumstance, despite presenting "wrenching decision for a district court"). The government acknowledges that a sentence of incarceration will likely have a

[5] The United States Sentencing Commission amended the guidelines in 2025 to remove departures, including § 5H1.6, pertaining to family ties and responsibilities, but such considerations can still inform whether a variance is appropriate.

negative effect on his children. But while unfortunate, the defendant has not shown that his presence is so uniquely indispensable to his youngest son that other adults – such as extended family members (*see* ECF No. 107 at 2) or anyone else designated to care for him – could not be trained to respond to any medical emergency that may arise.

**CONCLUSION**

The nature of this fraud is egregious, and the defendant's history is full of questionable business practices. Although the defendant's family will be adversely affected by his absence, this does not fully counterbalance the nature and circumstances of the offense or the need for deterrence. The government submits some carceral sentence is accordingly called for to reflect the seriousness of the offense and to promote respect for the law. The government submits that a guideline sentence is sufficient but not greater than necessary to achieve the goals of sentencing.

Dated: August 20, 2026

Respectfully submitted,

DANIEL N. ROSEN
United States Attorney

By: /s/ *Jeanne D. Semivan*
Special Assistant U.S. Attorney
600 U.S. Courthouse
300 S. 4th Street
Minneapolis, MN 55415
Attorney reg: 676694 (Massachusetts)
jeanne.semivan@usdoj.gov
(612) 664-5600